Next case of the morning is number 1630679, Coker v. Whittington. Mr. Cameron. May it please the court, Nelson Cameron for Michael Golden and Brandon Coker. Michael Golden and Brandon Coker were dedicated deputies with the Bossier Parish Sheriff's Office until about November 24, 2014. Mr. Golden had 10 years as an officer, was a detective, and until their discharge. There was no showing that they had done anything to violate any other rules other than what are at issue here in this case. Both Mr. Coker and Mr. Golden were childhood friends. They grew up together, then became deputies, married. Mr. Golden married Farrah Golden. They had two children at the time, two boys about 10 years of age. Mr. Coker, he was a K-9 officer as I said before, had two children, one age 7, the other age 12 boys. They knew each other well. They participated in social activities for a long period of time, and then something very remarkable happened among these four individuals is that Mr. Golden fell in love with Ms. Coker, and Mr. Coker fell in love with Ms. Golden. They met together with their family, their parents, their children, and made a decision that they would cohabitate with the custody, and they would generate an atmosphere of what they thought was love between them, a very intimate and personal decision that they made under circumstances how to raise their family and how to raise their children. When all this happened, I guess in the fall of 2014, about how many officers were there in the Sheriff's Department? I believe, I've gone to the website, I don't think there's anything in the record about this, but at the website for the Bossier Parish Sheriff's Officers, approximately 450 employees. How many of those employees are officers? I don't know. Population of the Bossier Parish is about 125,000. They, about October 31st, Chief Deputy Owens was notified of a situation that was going on amongst these four individuals, the two wives and the two deputies. He reported that to Internal Affairs of the Bossier Parish Sheriff's Office. Internal Affairs required the two deputies to come in and give a statement. They admitted that they had living arrangements where they were living with the other's wife with consent and with the intent to form a marriage and to raise a family and children in that atmosphere. It seems from the case law that if there had been some disruption in the Police Department or the Sheriff's Department about this, that they probably had authority to discipline or terminate or whatever. I believe that would be correct. Under the authorities I have read, if there is a material and substantial reason to discharge because of interference with the operations of the law enforcement agency, yes. What is your best case that says that the agent, the Sheriff's Department or the government has to wait until there's actual disruption or actual interruption or animosity before they take action? I believe that the best cases along that line first start out with the Pickering case. Then here in the Fifth Circuit you look at Battle v. Mulholland, which specifically indicates that the employer should not anticipate the community is going to have some kind of an issue with the actions of the officer. I believe in this case it's one of the things that the Sheriff indicates is that the situation developed among the four individuals was going to hold the Sheriff's Office in disfavor and maybe affect the trust of the community. Well, I'm just saying, looking at the possibilities from the Sheriff's perspective on November 3rd, both offices are at that point saying, hey, we're all copacetic, this is fine. But you don't know what's going to pass out. It might not be copacetic. My question is, does the Sheriff's Office have to wait until there's personal animosity or loss of trust by other officers? Well, I think the Sheriff would have to have some rational, at least a rational basis, to believe that there could be some efficiencies. There's other lawful behavior. The plaintiffs were engaged in lawful, private, off-duty sexual consensual behavior. So it's all lawful. If you have a marriage, conventional marriage, and that marriage starts to fall apart, as a Sheriff, would it be appropriate for him to fire the spouse that works for the Sheriff's Office simply because of going through a divorce? I would think not. I would think that the Sheriff would have to have some basis to believe. But when you've got two officers who are now married or now living with each other's spouses, soon-to-be former spouses, but at that moment in time spouses, there's at least the potential for some friction to develop. There's potential for friction in any relationship, though. Why would that potential be greater in this case? Well, it's personal. I mean, you know, when you are sleeping with someone else's spouse, maybe they're copacetic in the beginning and said they were, but is there potential for that to change? These can be emotional situations. I'm just asking, does the employer have to wait until there's actually disruption between the two, or animosity, or hard feelings? I would say there should at least be some kind of sign of it. I mean, maybe they don't have to wait until it actually explodes, but at least they'll wait until you see the fuse lit. Well, you think, I mean, let's get to the standard of review here. What is our standard of review for the Sheriff's policy? That's a good question, Your Honor. There are two rights at stake. One is the First Amendment right of association, association with an individual to create an intimate, loving relationship. Wait a minute. No, let's just, what is the standard of review? Because there have been cases where the policemen put nude photos of themselves on the internet, and they get fired. And as far as I know, those firings have been upheld because they cast disrespect on the police department. Yes, Your Honor. When the police department becomes known as a place where the cops are more interested in wife-swapping than they are in enforcing the law, that casts disrespect on the police department. At least one can make that argument, no matter how loving everybody is. So, you know, under what standard do we judge the enforcement of the policy? I think this Court must look at Battle v. Mulholland and Pickering. Well, as you very well know, Battle is in, you know, has to do with race. 1971. Yes, but it was a freedom of association case. That makes it key. The Battle was based on Pickering, and it's a First Amendment, yet the state has to show a compelling interest in the way it's been framed as materially and substantially interferes with the performance of the officer. So we have a standard for First Amendment freedom of association. Then you also have a rational review under substantive due process. What's your most recent case? Because Garcetti says that you do not have absolute freedom as a public employee, even to speak out on a matter of public concern. Yes. That is a different kind of—I mean, that's a free speech, not a free association. Free association, you have to have a compelling— It's all a First Amendment to me. I mean, they all have pretty high rank in the constitutional spectrum, so—and the Supreme Court was unequivocal in Garcetti, modifying Pickering. Yes, Your Honor. And Garcetti did involve a First Amendment right of speech regarding—for a DA to make a—I believe it was the one about the warrant, if I'm not mistaken. Right. And that was made in the course of that individual's duties as a DA. This, on the other hand, are totally private decisions that have been made among four people about how they're going to raise their children, how they're going to live their marriage, and how they're going to establish their home. It's a completely different framework. So we look at whether it is—a compelling state interest has been stated under Pickering. That compelling state interest is formulated as substantial material interference with the efficiency of the office. But Pickering was another one of your free speech cases, right? Or am I thinking—are we thinking about—is there another Pickering? I'm sorry. I thought Pickering was one of those free speech cases. It was. Okay. And in Battle—see, in the case of Battle, that was a First Amendment freedom of association case. Pre-Pickering. It adopted Pickering. It used a Pickering analysis. I don't—I think it was pre-Pickering. I just looked at Battle. It was 1971. Yes, Your Honor. Well, Pickering may have been 68, maybe. You're right. It does quote Pickering. Okay. Another right at issue is this idea of due process notice that the code of conduct that the sheriff had did not put the officer's own notice that off-duty, private— Well, but then they got notice on November 3rd, and they had until November 20th. They were told on November 3rd that the employer thought this was a problem, and they had until November 20th to do something. So they had notice for 17 days. Had no incentive. They had 17 days notice. I mean, it might not have been a written policy, but— Yes. They were told on November— They had 17 days to make a decision. That is correct. They did—they had that, but there were, of course, other conditions that weren't acknowledged by the sheriff's office that had been told to the officers by the chief deputy that is not engaging in any other sexual relationship and not any other violations of a similar fashion, and this idea of no contact that the chief deputy had told both of the officers in separate meetings. So there were some other conditions, and the sheriff did not explain the code of conduct sufficiently. There was a lot of issues even after the chief told the officers about no sexual relationship. Did that involve, well, I can't spend one night with the other lady. I can't kiss her in public, or is there public displays of affection? Are they as well— Why was the district court wrong in saying, in disregarding this argument of yours? Why was he wrong? Because the formal notice to them just says, move out until you get divorced, right?  Well, that was the written notice that said, do this or you're fired. I'm going to reserve my time, if I may. Oh, well, no, you've got two minutes, actually. I'm sorry? You've got two more minutes. Oh, I got two more. I'm sorry. I thought it was for the full 20. I believe the district court was wrong because the district court, Adlai, matter of its decision indicated that the return to work was predicated simply ceasing their living arrangements, and that was not—that's not correct. How long does it take people to get divorced in Louisiana? Depends on what kind of divorce you get, but if you're living separate and apart, I believe it's a year. You have to live separate and apart for six months, and then you can file, and then after that filing, I'm not a divorce lawyer, but I believe it's— Well, because I just noticed that the one couple got married a year later, and it wasn't clear when the other couple got married, so it seemed to take a while. They got divorced at the same time. They had the same lawyer, if you might have noticed from some of the pleadings in the divorce, they had the same lawyer. I can't explain why one got married one day, the other one— Quantity discount. I'm sorry? No, thank you. Okay. Let me ask you about—you just mentioned your vagueness and overbreadth challenges to the code of conduct. In the last 10 or 15 years prior to this incident, were there any other occasions where this code of conduct provision was invoked relative to an association or a First Amendment or a personal choice as you framed the issue? The only time I've seen any decision that might have been critical of that type of code of conduct was in Chicago when it was taken up to the Supreme Court and there were three dissents for not granting cert in that dissent. There was some criticism of it, but I haven't— I'm talking about specifically in Bossier Parish. When these two—when the two plaintiffs were employed there, why don't we use that time frame, which they were employed there, as you said, a substantial period of time, was this provision invoked with regard to anyone else's conduct of the First Amendment nature that you argue here? There is some—there are some individuals who had engaged in sexual infidelities who were brought to discipline under this code of conduct. I'm not sure what legal action, if any, they took. I don't know. Does that answer your question? Yeah, that's what I'm wondering. You have time for rebuttal, sir. Mr. Byrd. Good afternoon. Edwin Byrd on behalf of the defendants. I think that the Court's questions have kind of hit what we think are the significant issues as well, but I wanted to start a little bit talking about what the record was just to make sure we understand. I think these letters, which are in the record and as defendants record excerpt tab 3 and 4, make it difficult to suggest that the condition at issue was anything other than what the letters state. And if I could read real quick— We've read the brief. Oh, okay. I'm sorry. It's basically a question—they're concerned about this no-contact business, and the response is that's not a condition. The only condition is living separate from a married person. So I think that that frames the issue for the Court, is this record is undisputed and it's a legal issue as to whether a rational basis to consider that can be articulated. I mean, that's the extent of the analysis. I think there's a lot of briefing about Lawrence and post-Lawrence. I think this Court has been pretty clear in its rational review post-Lawrence. That reliable case, I think, was one that directly addressed it. And so the issue then becomes, is prohibiting this type of conduct rational? Can you articulate something? And Judge Owen, you were correct in how you posed the question. Do you have to wait for disruption? Mr. Cameron said, no, you don't have to wait for an explosion. But of course, the answer to that is there's not a case that says you have to wait for actual disruption. There's not a case that says you have to have some interruption in the actual day-to-day operations at that time. Of course, you can expect there's all kinds of scenarios that could be disruptive. I mean, we know in hindsight— What's the best case that says you don't have to wait? I think it would be every one of the cases that addressed adultery in a police setting, because there was not disruption in any one of them. I can't recall a specific case that described that. The Eastern District of Michigan case that Judge Walter referenced, that Court did reference the fact that at what point do you have to wait for just a relationship to become more serious? That was more in directing whether the right at issue is fundamental or not. These cases are talking about more than internal discipline within the Sheriff's Office, aren't they? They're also talking about the public reputation of the Sheriff's Office and the way the Sheriff's Office must be perceived in order to have credibility among the public. Judge, that's how each of those cases addressed it. Each of the district courts that looked at it said this can affect the reputation, this can affect the cohesion, this could place it in a light in the community. I mean, we have to look. These really are unusual facts. I mean, essentially, Sunday, one family moves in with one, and Monday, they claim the other one moved in, essentially crossing U-Hauls. It's a unique fact set. One husband moved in with his mother for a period of time. That's correct, but they each say we moved in with the other family on Sunday and Monday. The Halloween was Saturday night when this all kind of started, so we're not sure. That's really not material to this, but the fact is that to a community, the perception is that this is unusual, and I guess I really, in hindsight, perhaps it's not wife swapping or whatever was referenced initially, but at the time, it sure looked like it, and so I think that that can bring disrepute to the agency. That does look highly suspicious. It looks like it could be something, so you have two issues there, Judge Jones. One is the reputation of the agency. That's a rational consideration that all these cases acknowledge, and then also with respect to the disruption, the scenarios under which this could become a problem, or you could go on and on. They're going to be living in each other's homes. There's going to be financial issues, perhaps. The kids are involved in this. What happens when one's not happy and the other one is? I don't know. Are all of the employees of the Sheriff's Office at will employees? Yes, sir. Operating under a contract or under a CBA or anything? That's correct. There's not a cause provision any place. It's at will. And what sort of guidelines would there be, or are there any, over and above this code of conduct provision, which seems, maybe you'll disagree with me, but seems somewhat subjective. Do not engage in any illegal, well, that part's not subjective, immoral or indecent conduct, nor engage in any legitimate act which, when performed in view of the public, would reflect unfavorably on the Bossier Sheriff's Office. That's something for the Sheriff himself or herself, as the case may be in the future, to decide, pretty much up to that Sheriff. Is that not correct? Well, you're right. There's not any more descriptive provisions in there. There's no definition on this beyond this provision. Right. You touched a little bit on a question about the prior history there, and I apologize I can't point to it in the record, but the Sheriff was asked in his deposition, which plaintiffs included in their summary judgment filings, about three or four other occasions where people who had different affairs and were subjected to discipline. This Sheriff's Office position is an elected position, am I correct? That's correct. The Sheriff had been there, I think, four years is what the record shows at the time. He does have a reputation for trying to run a pretty clean and reputable agency. It's been an issue to try to overcome some historical. He talks about that a little bit in his deposition. So, I think that that, but the point, though, I need to make is that is a standard kind of a condition that we see. It's been addressed. If I could real quickly, the Siegmiller case, which is Tenth Circuit, it said you can't bring disrespect to the agency, and that's a good Tenth Circuit case dealing with this very issue. Well, one must admit that what is viewed by the community as moral or whatever has been a rolling standard in the last 20 years. There's no question that I think the courts have recently started to address. We can't just say based on morality alone certain of these issues, and I don't think that's where we're going. I think there's a rational basis separate apart from some morality issue that this is a little more unusual than just something that might just be on an immoral grounds. But just real quickly, the Shago case for this court way back, it said should not bring unfavorable criticism to the agency. The Shumpert case said you should keep your private life unsullied. Their two cases had that in it. That's kind of some old language. Then we've had unbecoming, et cetera. One point that I would like to make before I forget is in the Shago case, the court was a little bit general it was, but they commented they were critical of the agency for not giving them a chance to correct whatever it was. I don't remember seeing anybody else talk about that. I did recall that from Shago way back, and then they were dealing with it. It was kind of a general one, and they said we think it might be unfair that it's so general, and we sure wish they could have told them, hey, you're violating this, and give them a chance to change it. So I think this case, that's pretty critical, too. When they have specific instruction, this is all you have to do, and they elect not to do that. So I think that's the vagueness issue. It's like these courts. I think the district, the D.C. Circuit opinion we referenced, they did a good job of explaining you can't put something in there about everything, and as long as it's not a criminal case we're dealing with, and as long as it's not a protected constitutional activity we're talking about, that we really can't expect much more than something as general as this. In this unique setting where it's two families exchanging in kind of unusual circumstances, I think they understood it. I mean, there's no admission of that. There was some issue about why didn't they come tell everybody they were doing this. That may have been part of it. I think it's not hard to articulate that this is something that people would have, it raises eyebrows about what's going on. Let me just put this very simply. I did not see a single case where conduct of this sort, or related to this sort, was held to be constitutionally protected in a police department, and I also draw attention to Kelly v. Johnson. Is that fair to say? That's correct. So the only way one can get to a claim of recovery for the plaintiffs is by saying that the law has fundamentally changed in the last three or four years? That's correct. Okay. That's why all the briefing was done about Lawrence and what's happening since then. There hasn't been a whole lot. I mean, I think a lot of cases are reliable cases, and then the recent same-sex case, I can't remember the name of that one, but that one didn't really say much about it. But I think what's critical on that issue, Judge, is the way we frame the right has to be precise. If we're creating a new right that hadn't been recognized before, there's an analysis that has to be done. That was my question. Remind me, this is a 1983 claim, right? Correct. Nothing more? Nothing more. First Amendment, Fourteenth Amendment. So why aren't you talking about sovereign immunity? Well, it's a political subdivision. I mean, a qualified immunity. Oh, and we are. I mean, part of the issue is the sheriff is the final policymaker for purposes of terminations. The sheriff, we should get qualified immunity for sure on this, because he's sued personally, and Chief Deputy Owens was just communicating with these people. He obviously should get qualified immunity. There's clearly not clearly established, or we wouldn't be spending all this energy. That's what I'm saying. He was even assuming arguendo that there were some protected status here. The law does not seem to be clearly established in these circumstances. Definitely. That would be a violation. But to be candid, then, the Monell claim is here, and the sheriff is the final policymaker for the sheriff's office on taking action like this, and he's the one who imposed the condition. If it's an unlawful condition, then he doesn't personally have liability, but there could be Monell liability. Well, but they only sued the two individuals. And they sued the sheriff officially as well, which we would consider that the agency. But as to that issue, there's no question that the sheriff communicated that he wanted to move it out, and I just don't see that any court so far has expanded the constitutional privacy interest under the 14th Amendment or the freedom of association issue under the First Amendment to encompass living in this circumstance, and particularly when you frame the right at issue as narrowly as the cases would require that we do. Just real quickly, with respect to, I guess there hadn't been much comment on the evidentiary issue. There was some argument that Rule 408 would prohibit the consideration of these communications. I think that Judge Walter was correct on that. He's shown deference in his evidentiary rulings like this, even at the summary judgment stage. But more importantly, this clearly was not a communication that's offered to show liability. It's an appropriate issue. It's how you communicate with these employees when they all of a sudden have counsel. And it's fortunate that he did have counsel who made it clear for us exactly what the condition was that the sheriff was placing there. So I think that's where I'd like to leave you. It's a rational review test. There's case after case that apply this under the rational review. The Chago, the Shumpert case from this court, there's Tenth Circuit, there's Sixth Circuit cases. They all look at the same issues and they recognize that. The issue could be called reputational. They're held to a little higher standard than the general public. There's trust. There's all kinds of issues that are, I call them, kind of big picture interference issues. But there's also, you could articulate more day-to-day issues. What could happen when the things aren't going well in the future? And seriously, without hindsight, this case is no different than all the other cases that have dealt with this. With hindsight, perhaps these folks are happier than they could have been in their motives. And maybe this is not a fair circumstance, but that obviously is not the issue. And I don't think this court should expand what's out there to create a privacy interest here. It's not the kind of right that historically has been recognized and shouldn't expand the association right here. And under that circumstances, there's qualified immunity for both of these officials. And there's no Monell liability because there's not a constitutional violation. Okay. I think you made your point. Unless anybody has questions. Okay. Mr. Cameron. My police court, the facts of the condition of return are in dispute. Both of these deputies in separate interviews with the chief were told that it was a no-contact condition. And it wasn't the only condition is cohabitation. Although this cohabitation by itself, we believe, would still be a violation of the right of association under the First Amendment and would be a violation or substance of due process, the right to privacy. There are two lines of cases. Let me ask you just a... Well, go ahead. And I think I explained this before, but there are two lines of cases. One under the First Amendment. Shago is not really under that. Shago, chiefly, was under due process. It mentions First Amendment right to privacy, but it cites Kelly v. Johnson. Kelly v. Johnson was explicitly only a due process analysis for the grooming and haircut situation in that case. As a matter of fact, it mentions the First Amendment only to contrast it against the due process. The challenge under Kelly was due process, and that's a rational basis. Admittedly, I'm just reading the summary at the beginning of that opinion, but it says Supreme Court Rehnquist held that the county's determination that a hair grooming regulation should be enacted was not arbitrary and therefore a deprivation of respondents' liberty interest in freedom to choose his own hairstyle. This is under the due process. It's not under the First Amendment. That's Kelly v. Johnson. Yeah, but a liberty interest is liberty interest, it seems to me. Kelly v. Johnson contrasts its ruling against the First Amendment and says under the First Amendment we've done restrictive regulations for state employees, but this claim implicates only the more general contours of substantive liberty protected by the 14th Amendment. Kelly v. Johnson is not a First Amendment case. It is a substantive due process, and Shago relied on Kelly v. Johnson. It did not make a, it mentions the First Amendment, doesn't make a First Amendment analysis. What about Sigmiller? Ballot v. Mulholland, Mulholland on the other hand, does make a First Amendment analysis and does make an analysis under freedom of association. Let me ask you a question here. I mean, again, I was asking you whether we judge this under rational basis or under some elevated standard, and I assume you're going for an elevated standard, but, you know, the most you can, I mean, one thing you can derive, you can talk about your business about sexual autonomy, but the whole point of the Obergefell case was to say the marriage is a special institution, and marriage is open to members of the opposite sex as well as it has historically been to heterosexual relationships, and, you know, this cohabitation, wife swapping, moving into different houses is a frontal assault on the institution of marriage. Well, we're not. Because it says that marriage means nothing. I love your wife, you love my wife, you know, heck, we'll just trade. It doesn't matter that we don't go through the formalities of law that are designed to protect the institution of marriage. It can certainly be argued that Obergefell did not say there is no longer an institution of marriage that deserves public recognition. Now, they didn't make that argument. Well, here we're not asking for the sheriff to recognize any kind of marriage outside of what the civil law provides. We're only asking that the sheriff, as Justice Brandeis said in Olmstead, to be let alone. No, but he'd be using the sheriff's department in a way that would put a thumb in the nose of people who believe in marriage. Well, this is one of the things Battle v. Mulholland talked about. Well, again, that was in the context of race, and it was nearly 50 years ago. Well, it's got the same kind of emotions, doesn't it, I think, that got white women living with a black man. No, they weren't living with a black man. I mean, I think the deal is maybe they were cohabiting, but it says they were boarding in his house. Right. But it generates the same kind of emotions, I think. Well, it did back then. Well, may I have another minute? You may have a little minute. Before you do that, let me ask you one question. You just mentioned it in the beginning of your rebuttal that there's a factual dispute as to what the conditions were on their return to employment. We just heard your opponent say that the only condition was that they ceased cohabiting with the married woman, that that was the directive. That's what they were given notice of, and they were given a period of time to rectify that. And I understand that in the exchange that followed later, that you contend there were some additional conditions that were put on. But at any point, did either of the plaintiffs say, you know, I can live with this first condition. I'll move out pending divorce and whatever else, but I can't live with these additional conditions. In other words, is it not moot whether or not there's a factual dispute? Because they weren't going to do the first thing anyway. They contend they had a right to cohabit. Is that correct? Well, I believe Mr. Coker at one time said all he had to do was stop the cohabitating. I think he said in his deposition, I don't know if that's in the record or not, but he said he might have gone back. But he still had the demotion. He still got no sexual relationship, still got no contact. Those things were still there. They were never disavowed. Those different things. I just wanted to say real quickly, there are other cases out there where you've got these kinds of sexual intimate relationships, adultery, but they're all concerned on the job, that the officer was on the job at the time or the officer was consorting with a victim of crime or with a drug informant. Let me ask you one final, and I appreciate that, we will look closely at all those cases. Your argument has, as Judge Owen intimated, we can't take this as a frivolous case under the current state of the law. But I do have one final question. Suppose a sheriff's deputy decides to cohabit with his 14-year-old daughter, and they're in a loving relationship, and mom says, I'm tired of that old bird anyway, and she can have him. Well, I think that would also be illegal, I think, if I'm following your scenario. Not in Arkansas. The age of consent may be 14 in Arkansas, but you're saying it's loving, everybody agrees with it, you know, what's the difference? Well, one's a criminal violation. Well, let's assume it's not, okay, make her 17 then. Say it's not a criminal violation. Incest. Incest. Well, I think that might be illegal. I'm not real sure. Well, it hasn't been prosecuted a whole lot, as you know, nor was sodomy before even Lawrence came up. So I'm just saying. Well, we know under Lawrence, morality is not a rational basis to interfere with a private relationship. But I don't know if I'm following your example exactly, but you're saying a minor child in the household begins to have a relationship with the. Let's say, I mean, you know, maybe they'll go for big love, you know, maybe they'll go for polygamy. Oh, I see. I mean, the whole, what your argument is, marriage bond means nothing legally, so why should any of these other prohibitions amount to anything in the face of love and commitment? Every case stands on its own facts. That would be my answer to that. I haven't thought about that, Your Honor. No, I'm just, okay. Well, thank you very much. We appreciate it. Court will stand in recess.